UNITED STATES DISTRICT COURT

FOR THE WESTERN DISTRICT OF MICHIGAN

SOUTHERN DIVISION

SHEPLER'S, INC.,

      Plaintiff,

      v.

JAMES F. WYNN, ARNOLD TRANSIT
COMPANY, UNION TERMINAL PIERS,
INC., and THE CITY of MACKINAC ISLAND

      Defendants.

Case No.:  1:10-cv-968

Janet T. Neff
 U.S. District Judge

| | |
|---|---|
| William J. Ewald (P22839)<br>Frederick C. Overdier (P40684)<br>BRAUN KENDRICK FINKBEINER P.L.C.<br>4301 Fashion Square Boulevard<br>Saginaw, MI  48603<br>(989) 498-2100<br>(989) 799-4666 (fax)<br>wilewa@bkf-law.com<br>freove@bkf-law.com | Edmond E. Koester<br>Florida Bar No.  87882<br>COLEMAN, YOVANOVICH & KOESTER, P.A.<br>4001 Tamiami Trail North, Suite 300<br>Naples, FL  34103<br>(239) 435-3535<br>(239) 435.1218 (fax)<br>ekoester@cyklawfirm.com |
| Attorneys for Plaintiff, Shepler's, Inc. | Attorneys for Plaintiff, Shepler's, Inc. |

**SHEPLER'S, INC.'S, BRIEF IN SUPPORT OF ITS MOTION FOR
TEMPORARY RESTRAINING ORDER OR FOR
<u>PRELIMINARY INJUNCTION REGARDING ORDINANCE</u>**

**ORAL ARGUMENT REQUESTED**

## TABLE OF CONTENTS

I.    Introduction ..................................................................................................... 1-5

II.   Statement of Facts ..........................................................................................6-10

III.  Law and Argument ...........................................................................................11

      A.    An Injunction Is Proper To Provide Deference To The MPSC...........................11

            1.    The MPSC Has Already Proclaimed Jurisdiction,
                  Therefore, Shepler's Has Prevailed ........................................................12

            2.    Shepler's Will Suffer Irreparable Injury If A Preliminary
                  Injunction Is Not Issued..........................................................................13

            3.    The Harm To Shepler's In The Absence Of Injunctive Relief
                  Outweighs The Harm To Defendants If Injunction Is Granted. ...............13

            4.    The Public Interest Is Served By Entering An Injunction. ......................15

      A.    An Injunction Is Proper To Cease CMI's Unlawful Acts. ...................................16

            1.     Shepler's Is Likely To Prevail On The Merits .......................................16

                  a.    CMI Has Acted Outside The Scope Of Its Charter .....................16

                  b.    CMI Has Acted Arbitrarily and Capriciously ............................20

            2.    The Remaining Elements Are All Fulfilled By Shepler's And A
                  Preliminary Injunction Should Be Granted ............................................23

IV.   Conclusion .......................................................................................................23

## INDEX OF AUTHORITIES

**Case law**                                                                                    **Page No.:**

*Arnold Transit Co. v. City of Mackinac Island*, 99 Mich. App. 266 (1980) ..................................7

*Champion's Auto Ferry Inc v Michigan Public Service Commission*, 231 Mich App 699, 707-708; 588 NW 2d 153 (1998).........................................................................................11, 17

*Detroit Citizens Street Railway Co v City of Detroit*, 110 Mich. 384 (1896) .......................16, 18

*Heath Township v.* Sall, 191 Mich App 716, 719 (1991)...........................................................21

*In re Certified Questions, Karl v. Bryant*, 416 Mich 558, 572 (1982).........................................21

*Kent County Theater Corp. v. City of Grand Rapids*, 14 Mich. App. 362 (1968).......................21

*McCormick v. Weaver*, 144 Mich. 6 (1906) ...............................................................................16

*Mester v. Morman*, 227 Mich. 364 (1924) .................................................................................16

*Michigan Bell Telephone Company v. Engler*, 257 F.3d 587 (6th Cir. 2001).............................13

*Michigan Coalition of States Employees Union v. Civil Service Commission*, 236 Mich. App 96 (1999); 465 Mich. 212 (2001) ......................................................................12

*Minturn v. Larue*, 64 U.S. 435 (1859)..................................................................................17, 18

*North Michigan Water Co. v. City of Escanaba*, 199 Mich. 286 (1917) ...................................18

*Van Buren Public School District v. Wayne County Circuit Judge,* 61 Mich. App. 6 (1975) .........................................................................................................................................13

*Wright v. Nagle*, 101 U.S. 791 (1879)........................................................................................17

**Statutes**                                                                                     **Page No.:**

Mich. Comp. Laws § 98.1 ...........................................................................................................22

Mich. Comp. Laws § 460.201- § 460.206...................................................................................1

**City of Mackinac Island Charter**                                                              **Page No.:**

MACKINAC ISLAND, MI, CHARTER, CHAPTER IX, § 1................................................................19

MACKINAC ISLAND, MI, CHARTER, CHAPTER XVI, § 1.............................................................19

## I.    <u>INTRODUCTION</u>

Shepler's, Inc. ("Shepler's"), has filed suit against James F. Wynn ("Wynn"), Arnold Transit Company ("Arnold"), Union Terminal Piers, Inc. ("Union"), and the City of Mackinac Island ("CMI" or "Island") to challenge an apparent attempt to create an illegal monopoly by the Defendants and to stop the destruction of Shepler's business and goodwill.  Forcing Shepler's out of business by allowing such conduct would represent irreparable harm to surrounding communities, businesses, and citizens.[1]

On March 16, 2011, CMI enacted a new franchise ordinance which replaces Defendants naked attempt to form a monopoly with a less transparent approach to accomplish the same result through oppressive and illegal municipal regulations.  This Court is now being asked to stop this end run by the Defendants.

The history between the parties is more fully developed in the following Statement of Facts.  However, two events have made this request for injunctive relief timely – (i) recent unlawful actions of CMI and (ii) the Michigan Public Service Commission ("MPSC") asserting its jurisdiction under the Carriers by Water Act, 1921 PA 246, MCL 460.201 *et seq*, commencing an investigation into the activities complained of herein along with the rates, fares, charges and schedules of the affected ferry boat companies.

Shepler's and the other ferry boat companies' current franchises expire on March 31, 2011, i.e., within the next few days.  Those franchises were granted under a Ferry Boats Ordinance in effect in 2010 ("2010 Ordinance") and at the time this docket was initiated. [Exhibit B].  On March 16, 2011, CMI enacted a new Ferry Boats Ordinance ("2011 Ordinance")

---

[1] Exhibit A is the verified affidavits of William R. Shepler, President, and Christopher Shepler, Shepler's Vice President, verifying that the facts set forth in this petition are true and accurate to the best of his knowledge, information and belief.

that is significantly different from the 2010 Ordinance. [Exhibit C].[2]   The 2011 Ordinance

purports to provide CMI with powers exceeding its statutory authority, including:

- increasing the penalties for violations to include injunctive relief deeming that any violation, no matter how minor, constitutes irreparable harm; [Ordinance § 4 and § 5]

- empowering the City Council to annually determine the minimum mandatory schedule of services; [Ordinance § 7(a)-(c)]

- mandating the ferry companies be bound by their initial schedule of services submitted on February 1, prior to notification of competitors' schedules; [Ordinance § 7(a)-(c)]

- requiring that ferry companies meet the arbitrary standard of having "adequate boats and equipment," in the judgment of City council, which presumably is a higher standard than the also required satisfaction of United States Coast Guard regulations; [Ordinance § 7(c)(2) and § 8]

- mandating the ferry companies be bound by their initial schedule of rates, fares and charges submitted on February 1, prior to notification of competitors' schedules, and only allowing rate adjustments on approval of council within thirty (30) days of a request; [Ordinance § 9(a)]

- eliminating the ability to provide discounted and complimentary tickets for certain groups and causes or on short notice, in response to competitive market forces; [Ordinance § 9(b)]

- nearly **tripling** the already excessive franchise fee from two and one-half percent (2.5%)/two percent (2%) to seven percent (7%), based on an all revenues formula (i.e., revenues to and from cities other than CMI); [Ordinance § 15(a)]

- providing CMI with the right to examine any and all books, accounts, records and papers of any ferry boat company, and audit the same;  [Ordinance § 15(e) and

- deeming a ferry boat company to be a public utility and regulating it as such, in spite of the MPSC's recent ruling that ferry boat services are not public utilities.  [Ordinance § 17]

The 2011 Ordinance is an arbitrary, capricious and unreasonable use of CMI's municipal

powers and Shepler's challenges its validity.  Therefore, Shepler's does not desire to surrender to

---

[2] Exhibit C is the available version of the 2011 Ordinance at the time of filing. CMI had not yet issued the final ordinance as of the time of filing.  CMI indicated that a final copy would be released in approximately the last week of March 2011, a mere seven days or less before becoming effective on April 5, 2011.  For purposes throughout this brief, references to the 2011 Ordinance will be to the text of Exhibit C in the absence of the final ordinance.

the terms of the 2011 Ordinance and its terms and conditions, which create a contract of adhesion.  At the March 23, 2011, CMI Council meeting, the Council publicly reaffirmed its intention to issue criminal citations and pursue injunctive relief to stop any ferry company from operating without a franchise  under the newly enacted 2011 Ordinance.  This threat, if carried out, could put Shepler's out of business.

Subsequent to the initiation of this docket before this Honorable Court, the MPSC, recognizing the public interests and the jurisdictional issues at stake, commenced an investigation into the matters complained of herein on February 8, 2011.  The MPSC ruled in favor of its continuing jurisdiction under the Carriers by Water Act to investigate the appropriate rates, fares, charges, or tariffs of the ferries providing service to and from CMI, the City of St. Ignace ("CSI") and the Village of Mackinaw City ("VMC"). [Exhibit D].  The  MPSC's February 8, 2011, Order Commencing Investigation included the following:

- Sufficient facts alleged for the Commission to "*immediately* commence an investigation as provided for in Section 4 of the Carriers by Water Act[.]"[3] [Order, p 4] (emphasis added)

- The investigation is "to determine the appropriate rates, fares, charges or tariffs" of the ferries providing service to CMI, CSI, and VMC. [Order, p 6]

- The Carriers by Water Act provides continuing jurisdiction over the ferry boat carriers.  "That the Commission has not more pervasively regulated the rates, fares, charges, or tariffs of these ferries from and between CMI, CSI, and VMC is of no moment." [Order, p 5]

- "[T]he rates filed by the ferries before April 2010 currently remain in effect and will only be superseded by the filing of new rates at some point in the future. Because the suspension provision of

---

[3] Section 4 of the Carriers by Water Act provides: "Whenever any complaint shall be made to said Michigan public utilities commission by any person, firm, or corporation against any rate, fare, charge, or tariff of any carrier by water within this state, or against the neglect, failure, or refusal of any such carrier to make, observe or perform any rate, fare, charge, or tariff, or any rule, regulation, or service, said Michigan public utilities commission shall investigate the same, and it may regulate the performance or observance of any rate, fare, charge, or tariff, and any rule, regulation, or service, and may prescribe the same to be observed by such carrier…"

MCL 460.201 is only applicable to new rates, the request by Shepler for the Commission to suspend rates is premature." [Order, p 6].

- "As to the request in paragraph E on page 13 of the February 4 filing regarding whether to investigate the rules, regulation, or service of the Wynn Companies, the Commission finds that this investigation shall encompass all matters related to the schedule of rates, fares, charges, and tariffs applicable to each ferry company that will be serving the communities of CMI, CSI, and/or VMC during 2011." [Order. P 7]

- Directed public hearings in the affected communities of CMI, CSI, and VMC. Those public hearings are now scheduled for May 16 and 17, 2011, and will be "of a legislative nature that will help the Commission gauge the sentiment of the populace with regard to the issues presented by the February 4 filing." [Order, p 7]

CMI and the Wynn empire immediately challenged the MPSC's jurisdiction. During the MPSC proceedings, in oral argument on Defendants' motion to dismiss for lack of jurisdiction, Defendants argued that CMI has pervasive regulatory authority over the ferry boat companies as "public utilities" and only CMI had authority. Both the MPSC Administrative Law Judge and the MPSC soundly rejected the concept that the ferry boat companies are "public utilities":

> As argued by both Staff and Shepler's, that Act applies only to public utilities and not to entities regulated under the Carriers by Water Act. In this regard, the Commission on page 2 of the February 8 order held its regulation of intrastate ferry boats differs from regulation of public utilities; therefore, the City of Mackinac CMI's argument concerning the effect of the Michigan Public Utilities Commission Act can not be accepted. [March 21, 2011 MPSC ALJ ruling, Tr 108, lines 12-20] [Exhibit E].

MPSC Administrative Law Judge Mack denied the CMI and Wynn motions to dismiss the administrative proceeding on March 21, 2011.

On March 14, 2011, Shepler's asked the City to defer enforcement of the new franchise until such time as the MPSC and this Honorable Court have addressed the matters contested. [Exhibit F]. Within twenty-four (24) hours, CMI Counsel answered, no way! [Exhibit G] and its

representatives have since stated that any violations, no matter how minor, will result in criminal charges, revocation of ability to do business and injunctions.  CMI is ignoring the MPSC investigation as if there were no MPSC and no Carriers by Water Act.

There should be no doubt of the Island's predilection to liberally pursue enforcement against Shepler's.  On November 18, 19, 20 and 22, 2010, respectively, CMI issued misdemeanor citations to Shepler's for "operating/providing ferry boat service without obtaining a proper franchise from the City of Mackinac Island," even though Shepler's valid franchise agreement did not expire until March 31, 2011. [Exhibit H].  CMI's position on such criminal citations was that Shepler's service to the public into an extended season would financially harm Arnold Transit.[4]  Just last week, on March 21, 2011, the citations were dismissed by Judge Richard W. May, sitting in the 92nd District Court.

The true irony that Shepler's had to fight four criminal citations issued while it had a valid franchise is that it appears that the Wynn Defendants operated a majority of the 2010 season without submitting a written application for a franchise.  The 2010 Ordinance required, at Sec. 66-494(c) that, "No franchise granted under the section may be sold, transferred or assigned unless such transaction is first approved by the council after receipt of a written application therefore, containing the same information as to transferee as would be required of an original applicant."  Wynn acquired and began operating Arnold Transit in June, 2010.  Yet no franchise application from Wynn or any record of Council approval was produced after numerous Freedom of Information Act requests.

This incessantly over-zealous posturing by CMI leaves Plaintiff in grave concern that even if it applies for a franchise and surrenders to all of CMI's excessive and illegal demands, its very existence is threatened if this Court does not enjoin enforcement of the 2011 Ordinance

---

[4] Island's Brief in Response to Shepler's  Motion to Dismiss [92nd District Court], page 6 [Exhibit I].

pending conclusion of the MPSC proceedings and the final determinations of this Court. Granting the requested injunction will preserve the status quo and allow the Carriers By Water Act authorized regulatory process to proceed, taking advantage of the benefits of the highly trained, experienced technical professionals employed by the MPSC.  Moreover, preservation of the status quo means that Sheplers and the other ferry companies can continue to provide market-driven, competitive ferry services for Mackinac Island.

For the above stated reasons, Shepler's requests this Court grant a preliminary injunction and stay, ordering CMI to cease and desist from implementing the 2011 Ordinance and, consistent with the position of the MPSC, continue the status quo use of the 2010 Ordinance pending conclusion of the MPSC proceedings and the final determinations of this Court.

Should this motion be denied, Shepler's long-standing, well-recognized, sixty-five (65) year old family business is at serious risk, along with the employment of one hundred fifty persons (150), and the interests of the municipalities, businesses, and guests served by Shepler's, as a result of the continuation of the conspiratorial activities of the Defendants and their efforts to achieve a monopoly ferry franchise.

## II.    STATEMENT OF FACTS

Shepler's has been very successful in providing ferry service to Mackinac Island in a manner serving the public interest for sixty-five (65) years.  Shepler's carries more passengers to and from Mackinac Island than either of its competitors, Arnold and Star Line Mackinac Island Hydro-Jet Ferry ("Star Line").  Shepler's provides the best customer service, has the cleanest boats, advertises the most, and is known as being the best run ferry service to Mackinac Island.

Shepler's is a third-generation family business that directly employs over one hundred fifty (150) persons.  Shepler's has spent and is spending millions of dollars on boats, marketing, employees, land and docks, all in support of providing passenger and freight ferry service from and between CMI, CSI and VMC.  It is beyond dispute that Mackinac Island is among the state's tourism crown jewels, that tourism is vital to the state's economy and that ferry boat service to Mackinac Island is indispensible to tourism on Mackinac Island.

Historically, Shepler's and the other two competitive ferry companies, Star Line and Arnold, provided the needed ferry service to and from CMI through long-term (e.g., 20 year and 10 year), non-exclusive franchises granted by CMI.  In fact, the non-exclusive nature of the franchises was (and is) required by CMI's ordinance.  The three ferry companies operated on a highly competitive basis for years until the events which caused this suit to be filed and, even more recently, the events which caused this injunction to be requested.

The Defendants' actions further leading to the initial pleading on October 4, 2010, include the following:

<u>Wynn Events</u>

Wynn was Shepler's prior attorney with respect to advising Shepler's as to whether it should sell its business (which Shepler's decided not to do).  Wynn thereafter requested and obtained a very precise and limited conflict waiver [Exhibit J] to represent a third party in pursuing purchase of Shepler's, with Wynn anticipating majority ownership in the acquired Shepler's business. When Shepler's did not sell, Wynn threatened the Shepler family that he would cause their business to be ruined if they did not sell to Wynn.  The limited conflict waiver did not permit Wynn to engage in the threatening acts, to pursue the purchase of Shepler's business in other capacities, or to ultimately submit a proposal to CMI requesting that Shepler's

be put out of business and a monopoly be granted to Wynn.  Attached as Exhibit K is a proposal that was submitted by Wynn through his newly formed entity Northern Ferry Company to CMI on October 4, 2010.  Northern Ferry Company is represented as a combined operation between Arnold, owned by Wynn, and Star Line.

Wynn did manage to purchase Union which wholly owns Arnold.  In connection with this purchase, Wynn borrowed $18 million from Great American Life Insurance. [Exhibit L].  Based on Arnold's market share for ferry service and the cost to operate a ferry company, it is highly unlikely that Arnold could generate enough revenue from its operations to pay its debt service to Great American in the absence of Wynn's requested monopoly.  These facts provide more evidence that Wynn reached a deal with CMI to obtain a monopoly in exchange for certain property and docks owned by Arnold, as further described below.

CMI Events

At the same time that Wynn was threatening Shepler's that it had to sell its business to Wynn, or Wynn would utilize the money he would have paid Shepler's to eliminate  Shepler's as a competitor, he was working with CMI officials to engineer a deal whereby (i) Wynn would borrow money at a high interest rate to acquire Arnold and Union and sell Arnold's and Union's docks and a portion of Arnold's and Union's property to CMI, (ii) CMI would pay for the property and docks by issuance of public bonds, (iii) Arnold and Union would lease the property and docks back from CMI, and (iv) in exchange for selling the property and docks to CMI, Arnold and Union (both owned by Wynn) would receive a monopoly for ferry service to CMI.

CMI Council's Conspiratorial Delays

The 2010 franchises, which expire on March 31, 2011, were issued to the three ferry companies for a one-year term, contrary to past history.  CMI justified the one-year term by

claiming in January 2010 (i.e., 14 months ago) that it would be performing a study to evaluate the ferry business and how best to service CMI. [Exhibit M].  Such study was never even started. Instead, in October, 2010, CMI hired an auditor to review the revenue and cost structures of the ferry companies. [Exhibit N].

The impact of CMI's inaction over the past fourteen (14) months on the upcoming 2011 summer tourist season is that the ferry companies could not accurately plan their business operations.  In the past, rates, fares, schedules and other details of the business were established by the October preceding the next summer tourist season, e.g. in October 2005, rates, fares, schedules, etc. were established and in place for the 2006 summer tourist season, in October 2006, rates, fares, schedules, etc., were established and in place for the 2007 summer tourist season, and so forth. Therefore, the rates, fares, schedules, etc., for 2011 summer should have been established in October 2010. This was, and is necessary, to accommodate business planning and marketing such as printing brochures, attending pre-season tourism conferences, negotiating contracts with tour groups, and allowing hoteliers and restaurants on CMI to make arrangements.

Throughout the summer and fall of 2010, Shepler's frequently requested information from CMI regarding the continuance of its franchise past March 31, 2011.  CMI consistently dodged a direct response by saying that it had not been determined.

Shepler's properly applied in writing for a franchise under the 2010 Ordinance and filed schedules, rates and charges relating thereto on or about October 4, 2010.  Instead of granting Shepler's nonexclusive franchise as required by Section 66-494(a) of the 2010 Ordinance, CMI requested that each ferry service submit proposals by October 4, 2010, to CMI with whatever information the ferry operator wanted to include and without knowing what the proposals were to ultimately be used for. [Exhibit O].  The CMI request stated the goal of determining the CMI's

franchise plans by the end of October, 2010, reflecting and recognizing that historically, this was the time when schedules and rates would be set for the next season.

Wynn's October 4, 2010, a proposal represents that Northern Ferry Company was a combined operation between Arnold, owned by Wynn, and Star Line. Wynn's proposal was a clear confirmation of his negotiations with CMI. In fact, Wynn, through his proposal, boldly asked for a monopoly, for CMI to purchase certain docks and property owned by Arnold, and even included information regarding the appraiser, policy advisor, and municipal finance advisor to accomplish the proposal. There can be no question that Wynn's proposed monopoly and sale of property was fully discussed with CMI officials well before the October 4, 2010, due date, and outside the presence of Shepler's when viewing the nature of the language of the Wynn Defendants' proposal.[5] [Exhibit K]

On November 22, 2010, CMI Council, including one member employed by Arnold Transit, voted to issue two year franchises to each of the three ferry services based on terms and conditions yet to be determined by CMI. In the next motion at the very same meeting, CMI Council voted to approve a counter-claim in this litigation by CMI, against Shepler's. [Exhibit P]. CMI's Counterclaim can reasonably be viewed as an attempt to obtain a judicial declaration that CMI has discretionary authority to select or approve just "one" "non-exclusive" franchise for ferry boat service to CMI.

CMI then spent months delaying its decision regarding its desired terms and conditions that would be required in order to be granted ferry franchises for the upcoming season. During

---

[5] Northern Ferry's proposal states at page 4 "*The City has requested, in a letter dated September 26, 2010, that the current franchisees submit separate proposals addressing how they would approach providing: economies of scale to the current system; a more efficient economic model with respect to ferry capacity and cost optimization; and improving service performance ...*" This language and requested subjects for proposal discussion <u>do not</u> appear in the September 26, 2010 letter sent to the three franchisees or in any letter sent by CMI to Shepler's**. Exhibit O/**

this time, CMI again sought proposals from the ferry companies for schedules, rates and franchise fees to be charged.  Finally, on March 16, 2011, CMI voted to enact a new Ordinance.

Furthermore, CMI's delay follows with the efforts of Wynn and CMI to negotiate a sweetheart deal.  When the MPSC proceedings forced the Defendants' hands, their response was a quick and dirty new ordinance by which they could accomplish their ultimate goals.  The MPSC has now taken jurisdiction over the matter pursuant to the Carriers by Water Act.  Its experienced, technical experts have now begun their careful review.

Without injunctive relief to allow the MPSC investigation to proceed, Shepler's 150 employees, their families, local businesses and others will suffer irreparable harm.  Injunctive relief will block the implementation of CMI's unlawful acts. To preserve competitive ferry service to Michigan's crown jewel tourist attraction and in the best interest to the public, an injunction should be granted.

### III.    LAW AND ARGUMENT

### A.    AN INJUNCTION IS PROPER TO PROVIDE DEFERENCE TO THE MPSC

An injunction is appropriate to allow the MPSC to conclude its investigation.  The MPSC is a state agency with unique and significant expertise.  Its authority under the Carriers by Water Act is now nearly ninety (90) years old.  A court "must give due deference to the MPSC's Administrative expertise and legislative discretion." *Champion's Auto Ferry Inc v Michigan Public Service Commission*, 231 Mich App 699, 707-708; 588 NW 2d 153 (1998).

The four factors considered in determining whether to issue a preliminary injunction are well established, and set forth as follows:

1.    The likelihood the moving party will prevail on the merits;

2.      Whether the moving party will suffer irreparable injury if a preliminary injunction is not granted;

3.      Whether the harm to the moving party in the absence of injunctive relief outweighs the harm to the opposing party if an injunction is granted; and

4.      Public interest in the issuance of an injunction.

*Michigan Coalition of States Employees Union v Civil Service Commission*, 236 Mich. App. 96, 102 (1999); 465 Mich 212, 225 (2001).  Shepler's clearly fulfills each element to enjoin CMI from pursuing enforcement of the 2011 Ordinance to allow deference to the MPSC.

**1.      THE MPSC HAS ALREADY PROCLAIMED JURISDICTION, THEREFORE, SHEPLER'S MEETS THE LIKELIHOOD OF SUCCESS ON THE MERITS REQUIREMENT FOR INJUNCTIVE RELIEF**

In its February 8, 2011, Order Commencing Investigation, the MPSC ruled that it has continuing jurisdiction over the rates, fares, services and schedules of the three ferry companies serving CMI, CSI and VMC by virtue of the Carriers by Water Act, and that pending further order of the MPSC, it directed the 2010 rates, fares, services and schedules remain in effect until such time as one or more of the ferry companies file for new rates, fares, services and schedules. The MPSC's order stated that at such time as one or more of the ferry companies files for new rates, fares, services or schedules, the MPSC will consider whether to exercise its right to suspend the newly filed rates, fares, services or schedule as granted to the MPSC in Section 1 of the Carrier by Waters Act.

Simply stated, the MPSC noted that it has Section 4 investigatory authority and Section 1 suspension authority on the filing of new rates.   Given the currently pending MPSC investigation, the effect of the February 8, 2011, Order is a directive to the three ferry companies to continue to follow the 2010 rates, etc. until all investigations are complete.  All three ferry companies are parties to the MPSC matter and are represented by counsel.  CMI and VMC have

joined the MPSC investigation as interested parties and public hearings are scheduled in the three municipalities serviced by the ferry companies in May, 2011.

The Court should give judicial deference to the MPSC and allow it to conduct and complete its investigations(s), pursuant to the *Champion Ferry* case.  Granting the requested injunction will preserve the status quo and allow the Carriers By Water Act authorized regulatory process to proceed, taking advantage of the benefits of the highly trained, experienced technical professionals employed by the MPSC.

## 2. SHEPLER'S WILL SUFFER IRREPARABLE INJURY IF A PRELIMINARY INJUNCTION IS NOT ISSUED

If CMI continues its pattern and practice of over zealous enforcement under the expanded authority and penalties available under the unlawful 2011 Ordinance, Shepler's third generation family business is at risk of temporary and possibly permanent elimination.  Any temporary interruption of Shepler's business can cause unquantifiable harm to Shepler's good will and business relationships; thus significantly and permanently harming the Shepler family and their 150 employees and families.  Such loss of business is considered irreparable harm, because once lost, it cannot be recovered.  See *Michigan Bell Telephone Company v. Engler*, 257 F.3d 587, 599 (6th Cir. 2001) (wherein the court concluded loss of customers good will may irreparably harm a company).  The courts have also concluded that a threatened loss of employment has justified the issuance of a preliminary injunction to maintain the status quo.  *Van Buren Public School District v. Wayne County Circuit Judge,* 61 Mich. App. 6 (1975).

## 3. THE HARM TO SHEPLER'S IN THE ABSENCE OF INJUNCTIVE RELIEF OUTWEIGHS THE HARM TO DEFENDANTS IF INJUNCTION IS GRANTED

If injunctive relief is not granted, Shepler's will suffer the substantial harm described above.  By contrast, no substantial harm will occur to the Defendants if the injunction is issued.

The injunction would maintain the status quo. Multiple ferry operators will continue to service the businesses, visitors and residents of CMI, VMC and CSI as they have done for numerous prior years. In fact, the Wynn Defendants will financially benefit from the injunction as the 2% - 2.5% franchise fee will remain in effect, instead of the 7% under the 2011 Ordinance.

Furthermore, if an injunction is not issued, harm would occur to CMI, despite its willingness to agree to Wynn's proposals. The regulatory scheme, developed by Wynn, and implemented by CMI, has been analyzed and summarized by Dr. Henry H. Fishkind.[6] Dr. Fishkind summarized Wynn's October 4, 2010 proposal, which is nearly identical to that adopted by CMI. He concluded that the proposal would result in harm to CMI and local communities. In part, Dr. Fishkind's summary reads as follows:

> In its proposal to Mackinac Island ("MI") Northern Ferry Company, LLC ("Northern") proposes to: (1) obtain an exclusive monopoly on ferry service to MI for 20 years and (b) sell its docks to MI and then lease them back for a nominal rent. The debt service on MI's bonds will be paid exclusively from the franchise fee which would be increased from its current 2% to between 8% and 18%. If consummated, Northern would be granted a monopoly and be paid for the privilege. As a result, MI is ultimately at risk for Northern's performance since there are no other ferry providers. Furthermore, having obtained a monopoly for 20 years and having been paid for the privilege, Northern has little incentive to provide high-quality, innovative, low cost service to MI. The economics favor Northern to the detriment of MI and the public at large. [Exhibit Q, ¶17.0, page 5].
>
>                              ***
>
> There is no irreparable harm to Defendants that I am aware of that would offset the irreparable harm to Plaintiff [Shepler's]. Furthermore, the economies of

---

[6] Dr. Fishkind is an economist and Preside of Fishkind & Associates, Inc. ("FA"), a consulting firm with offices in Orlando, Naples and Port St. Lucie, Florida. His clients include state and municipal governments, the U.S. Department of Justice, Fortune 500 Companies, and major property developers, as well as both plaintiffs and defendants in litigation. He was a founding board member of two large publicly traded, development companies until each was sold. He regularly develops and publishes detailed forecasts for all 67 Florida counties. For many years he was a Research Economist with the Bureau of Economic and Business Research at the University of Florida, and from time-to-time served as its Acting Director and its Associate Director. He has also served on the Governor's Council of Economic Advisors under two different administrations. He has been qualified as an expert witness to provide expert economic testimony on more than 50 occasions by both the federal and state courts in Florida and in federal courts in Tennessee and Washington, D.C. He has also served as a court-appointed expert to provide valuation reports to the U.S. Tax Court.

> Mackinaw City, St. Ignace and MI will be harmed irreparably if Plaintiff is put out of business.  There will be reduced ferry service and a substantial reduction in advertising and promotion of the area should Plaintiff close.  Economic activity near Plaintiff's dock in Mackinaw City will be severely hurt by such a closure, and these local businesses cannot simply move close to Northern's remaining facilities.  In addition, as noted above, the proposed transaction is not in the best interests of MI or its residents.  Finally, the public at [*sic*] is injured irreparably from the institution of a 20 year ferry monopoly which will hinder innovation and has little economic incentive to provide quality service at the best price.  [Exhibit Q, ¶19.0, page 6].

Without a doubt, harm will occur to all parties except Wynn if the 2011 Ordinance is fully implemented. Therefore, this element heavily weighs in favor of a preliminary injunction as well.

### 4.    THE PUBLIC INTEREST IS SERVED BY ENTERING AN INJUNCTION

The public interest favors the granting of an injunction.  Shepler's has operated for the past sixty-five (65) years in the interest of businesses, residents and tourists to and from CMI. Prior to Shepler's beginning operations, Arnold operated as a monopoly running only five trips per day to and from CMI.  Shepler's entered the market, enforcing the positive effects of competition.  The status quo that Shepler's seeks to preserve is beneficial to the public interest, as stated in an October 6, 2010, Lansing State Journal Editorial, quoting the Michigan Chamber of Commerce: "*Competition has taken Mackinac Island from once-a-day ferries to run as often as every 15 minutes.  Without that competition, the quality and quantity of ferry service would not be what it is today and would likely decline in the future*."  [Exhibit R]

The greater extent of harm will occur in a trickle down effect to the communities in which Shepler's operates.  Significant harm will occur to local businesses.  The effects are best evidenced by the business communities numerous affidavits that were earlier filed. [Docket Entry 24-25].  The above sections of Dr. Fishkind's report also apply to the significant and irreparable harm to occur to the local communities.

The status quo that Shepler's seeks  preserve is beneficial to the public interest and thus all four elements required for injunctive relief are satisfied by Shepler's.

**B.    AN INJUNCTION IS PROPER TO CEASE CMI'S UNLAWFUL ACTS**

This court has the authority to enjoin the actions CMI has taken towards its goal of awarding the Wynn defendants a monopoly.  Under Michigan law, a court is authorized to enjoin the affairs of a city if the city is acting unlawfully, such as capricious conduct or acting outside its charter. *Kent County Theater Corp. v. City of Grand Rapids*, 14 Mich. App. 362 (1968).  "A court may properly substitute its own judgment for that of a licensing authority where the act of the licensing authority is found to be arbitrary or unreasonable." *Id* at 366.

The four factors previously described above are likewise fulfilled by Shepler's to enjoin CMI from its unlawful acts against Shepler's

**1.    SHEPLER'S IS LIKELY TO PREVAIL ON THE MERITS**

Shepler's raises two arguments regarding CMI's unlawful acts, (i) CMI has acted outside the scope of its charter and (ii) CMI has acted arbitrarily and capriciously.  Shepler's likelihood of prevailing on the merits of either claim alone is grounds for an injunction.

**a.    CMI HAS ACTED OUTSIDE THE SCOPE OF ITS CHARTER**

CMI has acted outside the scope of its charter in two respects.  First, Michigan statutes allows a council of a city to regulate and license ferries, but only within "reasonable terms." Mich. Comp. Laws § 98.1.  Also, Michigan law has long recognized that a municipality has no inherent authority to grant an exclusive license, permit or franchise unless the state legislature "explicitly" and "expressly" provides a municipality with such authority. *Detroit Citizens Street Railway Co v City of Detroit*, 110 Mich. 384, 388 (1896); *McCormick v Weaver*, 144 Mich. 6 (1906); and *Mester v Morman*, 227 Mich. 364 (1924).  This law has been clear in Michigan from

the 1800's forward, and has been confirmed by the United States Supreme Court. *Minturn v. Larue*, 64 U.S. 435, 435-436 (1859); and *Wright v. Nagle*, 101 U.S. 791 (1879) (ruling that state legislature did not give circuit courts right to grant exclusive franchise for toll-bridge, and would not imply exclusive franchise).

The Fourth Class City Act of 1895, MCL 98.1, provides:

> The council of a city may regulate and license ferries from the city or a place in the city; require the payment of a **reasonable** sum for a ferry license; impose **reasonable** terms and restrictions in relation to the keeping and management of ferries, and the time, manner, and rates of carriage and transportation of persons and property by ferry; and provide for the revocation of a ferry license and for the imposition of sanctions for the violation of an ordinance prohibiting unlicensed ferries and regulating ferries established and licensed. [Emphasis added].

"A decision is unreasonable when it is unsupported by the evidence." *Champion's Auto Ferry Inc v Michigan Public Service Commission*, 231 Mich App 699, 707; 588 NW 2d 153, (1998). Numerous provisions in the 2011 Ordinance lack evidentiary support, including, for example, the nearly three-fold increase of the franchise fee without corresponding support for the need for such revenue in relation to the regulation of the ferries; the new minimum schedule of services established for 2011 that mandates minimum numbers of trips per day and specific times of day without corresponding support for passenger traffic, adding nine hundred forty nine (949) new ferry trips to Shepler's 2010 schedule;[7] favoring CSI over VMI for November fast ferry service, despite Shepler's application to provide November fast ferry service from VMI only; the effective elimination of the ability to adjust ticket prices mid-season and to offer special discounts and free tickets in response to competitive market forces; CMI's discretion to determine "adequate boats and equipment" when they are not qualified to render such determination; and deeming the ferry service to be a public utility, after MPSC Administrative

---

[7] The CMI template minimum schedule for 2011 is attached as Exhibit U.

Law Judge Mack ruled otherwise.

The right to grant monopolies is not favored.  To grant a monopoly outright or indirectly through oppressive regulation is not just unreasonable, it is illegal.  Michigan courts have held that the authority to grant exclusive privileges may not be implied from the use of general language in a charter or statute that grants a municipality the right to issue a license or franchise. *Detroit Citizens Street Railway Co v City of Detroit*, 110 Mich. 384, 388 (1896); and *North Michigan Water Co. v. City of Escanaba*, 199 Mich. 286, 301 (1917) ("We agree with counsel for defendants that if a legislative act providing for the incorporation of a waterworks company gives no exclusive franchise in express terms, the law will raise no grant thereof by implication.").

In the United States Supreme Court case of *Minturn v. Larue*, the plaintiff, a ferry boat operator, had filed suit against the defendant, another ferry boat operator, to prevent him from running a ferry between San Francisco, California, and Oakland, California.  *Minturn v. Larue*, 64 U.S. 435, 435-436 (1859).  The plaintiff claimed to have an exclusive right to provide ferry service that was granted by the city of Oakland pursuant to the city's charter.  *Id.* at 436. The charter granted the city the "power to make such by-laws and ordinances as they may deem proper and necessary;" among other things to "regulate…ferries[.]" *Id.*  The United States Supreme Court affirmed the ruling of the circuit court in favor of the defendant ferry company and determined that the city of Oakland was without power to grant the plaintiff an exclusive right to provide ferry service because the language in the charter did not expressly intend to give the city this power.  *Id.* at 438.

In the Supreme Court of Michigan case of *Detroit Citizens' St. R. Co. v. City of Detroit*, the plaintiff filed suit against the defendant to restrain the defendant from constructing and

operating a street railway. *Detroit Citizens' St. R. Co. v. City of Detroit*, 110 Mich. 384, 386 (1896). The plaintiff alleged that it had the exclusive privilege under a city ordinance to construct and operate street railways, including the first right to build any other railways in the future. *Id*. The Supreme Court of Michigan affirmed the ruling of the Circuit Court and determined that there was no explicit and clearly expressed authority given to the city council to grant this exclusive privilege to the plaintiff, and it would not imply this authority. *Id*. at 387-396.

In the instant case, the Charter of Mackinac Island does not explicitly or expressly provide CMI with the authority to grant exclusive franchises, and, in fact, prohibits such action. Michigan Local Act No. 437 of 1899, incorporated the City of Mackinac Island and established CMI's Charter. The Charter serves as CMI's enabling statute providing its powers and outlining its responsibilities. Chapter IX, Section 1, of CMI Charter provides, in relevant part[8]:

> Thirteenth, to establish or authorize, **license and regulate ferries to** and from the city, or any place therein, or from one part of the city to another, and to regulate and prescribe from time to time charges and prices for the transportation of persons and property thereon.

MACKINAC ISLAND, MI, CHARTER, CHAPTER IX, § 1 (emphasis added)

Additionally, Chapter XVI, Section 1, of the City Charter provides[9]:

> The council of said city may regulate and license ferries from such city or any place of landing therein to the opposite shore, or from one part of the city to another; and may require the payment of such **reasonable sum** for such license as to the council shall seem proper and may impose such **reasonable terms and restrictions** in relation to the keeping and management of such ferries, and the time, manner, and rates of carriage and transportation of persons and property as may be proper, and provide for the revocation of any such licenses and for the punishment, by proper fines and penalties, of the violation of any ordinance prohibiting unlicensed

---

[8] *See* **Exhibit "S"**, Part I- Charter, Chapter IX, Section 1.
[9] *See* **Exhibit "T"**, Part I- Charter, Chapter XVI, Section 1.

ferries, and regulating those established and licensed.
MACKINAC ISLAND, MI, CHARTER, CHAPTER XVI, § 1 (emphasis added)

While Mackinac Island has the ability to regulate ferry service pursuant to CMI's Charter, similar to the city's power in *Minturn v Larue*, CMI has no explicit or express authority to grant exclusive franchises based on the clear wording of the Charter. Without the authority to grant exclusive franchises, CMI is acting in direct violation of the rulings of the United States Supreme Court and Michigan courts by working with Wynn to monopolize ferry service, either directly as was initially pursued or indirectly through the unreasonable regulation of the ferry services.

Even more damaging is the fact that CMI's Charter specifically prohibits the granting of exclusive franchises. Chapter IX, Section 1, of CMI Charter, provides in relevant part as follows[10]:

> Fortieth, the council shall further have authority to enact all ordinances, and to make all such regulations, consistent with the laws and constitution of the state as they may deem necessary for the safety, order and good government of the city, and the general welfare of the inhabitants thereof; **but no exclusive rights, privileges or permits shall be granted by the council to any person or persons, or to any corporation, for any purpose whatever.** (emphasis added)
> MACKINAC ISLAND, MI, CHARTER, CHAPTER IX, § 1

In its interpretation of a provision containing almost identical restrictive language, the Michigan Supreme Court, in *North Michigan Water Co. v. City of Escanaba*, held, in part, that the restrictive language prohibited the City of Escanaba from issuing an exclusive franchise to a private water company. *North Michigan Water Co. v. City of Escanaba*, 199 Mich. 286, 297 (1917). As a result of the Charter's clear prohibition against exclusive franchises and the lack of any explicit or express authority to grant exclusive franchises, CMI has no authority under its

---

[10] *See* **Exhibit "L"**, Part I- Charter, Chapter IX, Section 1.

Charter to grant an exclusive franchise or monopoly, either directly by Council action or indirectly by Council inaction and/or excessive regulation.

### b.    CMI HAS ACTED ARBITRARILY, CAPRICIOUSLY AND UNREASONABLY

Under Michigan law, a court is authorized to interfere with the affairs of a city if the city takes actions that are arbitrary, capricious or unreasonable. *Kent County Theater Corp. v. City of Grand Rapids*, 14 Mich. App. 362 (1968).  In *Kent County Theater Corp. v. City of Grand Rapids*, the plaintiff brought suit against the City of Grand Rapids to prevent the city from denying the plaintiff a motion picture theater license. *Kent County Theater Corp*, 14 Mich. App. at 364.  The trial court ruled in favor of the plaintiff and permanently enjoined the city from further denying the license.  *Id*. at 364-365.  The appellate court affirmed the lower court's decision and held that the reasons given by the city commission for denying the license were arbitrary, capricious and unreasonable.  *Id*. at 366.

In the instant case, the CMI Council has acted arbitrarily and capriciously from September 2010 forward by failing to approve Shepler's repeated requests and application for a non-exclusive franchise for the 2011 season, and thereafter causing Shepler's to be the subject of a criminal prosecution for activity that CMI now contends was harming Shepler's competitor. Shepler's met the required criteria under the Ordinance in existence at the time of application. Shepler's rights under its arrangement with CMI should be deemed vested under the ordinances in effect when Shepler's applied for renewal. *In re Certified Questions, Karl v. Bryant*, 416 Mich 558, 572 (1982); *Heath Township v.* Sall, 191 Mich App 716, 719 (1991).  There is no valid reason why the CMI Council denied or failed to act upon Shepler's renewal application in 2010.

Instead of timely acting on Shepler's request for a 2011 franchise, CMI engaged in an ongoing subterfuge of repeatedly requesting new proposals and other information, until Shepler's

called the CMI bluff by requesting that the MPSC commence its pending investigation in February, 2010.  For example, in the September 26, 2010, CMI request for proposals [Exhibit O], Shepler's was asked to provide information in support of a renewal application, including providing information on something never requested before: "*property proposals*."  "Property proposals" represent a subject that has no bearing on the criteria set forth in the Ordinance.  In addition, "property proposals" are not something that can be argued to be applicable to the "reasonable terms and restrictions in relation to the keeping and management of ferries." MCL 98.1.   Yet, the request is confirmation of Shepler's concern that Wynn and CMI were orchestrating a deal to purchase docks in exchange for awarding Wynn an exclusive ferry boat franchise.   The subterfuge continued after the September 26 request for proposals, as CMI followed up with numerous requests to provide detailed corporate cost data and new ferry schedules, rate schedules, and franchise fee proposals.  Publicly stated deadlines for action were repeatedly missed until CMI passed the 2011 Ordinance on March 16, 2011, fifteen (15) days before the 2010 franchises expired and well after planning and commitments for the 2011 season were made.  By repeatedly requiring written proposals and other information from the ferry boat operators that were not contemplated by CMI's Ordinances, violating its own Charter by pursuing monopolistic and anti-competitive deals with Wynn, and adopting a new ordinance with mandates that have no direct correlation to any identified factors other than regulatory requests by Wynn for oppressive schedule, franchise fee, and enforcement mandates, CMI is in direct violation of Michigan law and is acting arbitrarily, capriciously, and unreasonably.  Such can only be viewed as an effort by CMI to find some grounds to either deny Shepler's a franchise or to unlawfully favor Shepler's competitor.

As a result, it is likely that Shepler's will prevail on the merits.

    2.    **THE REMAINING THREE ELEMENTS ARE ALL FULFILLED BY SHEPLER'S AND A PRELIMINARY INJUNCTION SHOULD BE GRANTED**

The remaining elements necessary to grant a preliminary injunction are: (1) whether the moving party will suffer irreparable injury if a preliminary injunction is not granted; (2) whether the harm to the moving party in the absence of injunctive relief outweighs the harm to the opposing party if an injunction is granted; and (3) whether the public interest is in favor of the issuance of an injunction. *Michigan Coalition of States Employees Union, supra* at 102.

All three of these elements were discussed above in regards to granting an injunction in order to provide deference to MPSC jurisdiction and were in favor of the preliminary injunction being granted.  The above discussion provides that an injunction should be granted and applies with equal force towards CMI's unlawful action.

### IV.    <u>CONCLUSION</u>

Shepler's is entitled to preliminary injunctive relief allowing it to continue beyond March 31, 2011, under the terms of its 2010 non-exclusive ferry franchise until the conclusion of these and the MPSC proceedings and a trial on the merits.  All four of the elements that must be considered in the analysis of whether to grant a preliminary injunction favor Shepler's and have been shown with sufficient particularity so that maintenance of the status quo will not cause the Defendants material harm.  By issuing a preliminary injunction, this Court would be requiring CMI to abide by the Ordinances as they existed until just recently amended, allowing the existing ferry boat service to Mackinac Island to continue, as it has satisfactorily served the public to date and also respect the jurisdiction of the MPSC in utilizing its specified knowledge to investigate.

**WHEREFORE**, Shepler's respectfully requests this Court to grant a preliminary injunction and stay, ordering CMI to cease and desist from implementing the 2011 Ordinance

and, consistent with the position of the MPSC, continue the status quo use of the 2010 Ordinance pending conclusion of the MPSC proceedings and the final determinations of this Court.

and grant Shepler's any further relief the Court deems just and appropriate.

**COLEMAN, YOVANOVICH & KOESTER, P.A.**
Attorneys for Plaintiff Shepler's, Inc.

Dated:  March 28, 2011    By: /s/Edmond E. Koester
                                  Edmond E. Koester
                                  4001 Tamiami Trail N., Suite 300
                                  Naples, FL  34103
                                  (239) 435-3535
                                  ekoester@cyklawfirm.com


**BRAUN KENDRICK FINKBEINER P.L.C.**
Attorneys for Plaintiff Shepler's, Inc.

Dated:  March 28, 2011    By: /s/Frederick C. Overdier
                                  William J. Ewald (P22839)
                                  Frederick C. Overdier (P40684)
                                  4301 Fashion Square Boulevard
                                  Saginaw, MI 48603
                                  (989) 498-2100
                                  wilewa@bkf-law.com
                                  freove@bkf-law.com


### CERTIFICATE OF SERVICE

I hereby certify that on March 28, 2011, a copy of the foregoing document was filed electronically.  Notice of this filing will be sent by operation of the Court's electronic filing system to all parties indicated on the electronic filing receipt.  All other parties will be served by regular U.S. mail.  Parties may access this filing through the Court's system.


/s/ Frederick C. Overdier
WILLIAM J. EWALD - P22839
FREDERICK C. OVERDIER - P40684
Braun Kendrick Finkbeiner PLC
Attorneys for Shepler's, Inc.
4301 Fashion Square Blvd.
Saginaw, MI 48603
wilewa@bkf-law.com
freove@bkf-law.com